## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Rudolph Technologies, Inc.,

     Plaintiff,       **MEMORANDUM OPINION**
                   **AND ORDER**
v.                Civil No. 15-1246 ADM/BRT

Camtek Ltd.,

     Defendant.

_____

Daniel W. McDonald, Esq., Merchant & Gould PC, Minneapolis, MN, on behalf of Plaintiff.

Wayne O. Stacy, Esq., Cooley LLP, Broomfield, CO and William F. Mohrman, Esq., Mohrman, Kaardal & Erickson, P.A., Minneapolis, MN, on behalf of Defendant.

_____

## I.  INTRODUCTION

On June 4, 2015, the undersigned United States District Judge heard oral argument on Defendant Camtek Ltd.'s ("Camtek") Motion to Dismiss [Docket No. 5] and Motion to Strike Pleading [Docket No. 75], and Plaintiff Rudolph Technologies, Inc.'s ("Rudolph") Motion for Preliminary Injunction [Docket No. 6].  For the reasons set forth below, Camtek's Motion to Dismiss and Motion to Strike are denied, and Rudolph's Motion for Preliminary Injunction is denied.

## II.  BACKGROUND

Rudolph, a Deleware corporation with a manufacturing plant located in Bloomington, Minnesota, claims patent infringement by Camtek, whose principal place of business is in Israel. Compl. [Docket No. 1] ¶¶ 1, 2.  Both parties are in the business of making, using, and selling automated visual inspection systems for the semiconductor industry.  Id. ¶¶ 1, 3, 8.

**A.  The Technology**

Rudolph owns the rights to United States Patent No. 6,826,298 (the "'298 Patent"),

AUTOMATED WAFER DEFECT INSPECTION SYSTEM AND A PROCESS OF

PERFORMING SUCH INSPECTION.  Id. ¶ 4; Compl. Attach. 1 (the '298 Patent).  The '298

Patent, issued in 2004, embodies an invention related to the manufacture of

semiconductors—vital components in computers, cellular telephones, and other electronics.  '298

Patent 1:14–15:46–48.  The manufacturing process begins with a wafer, which is a thin layer of

substrate, usually made of silicon crystal.  Mellor Decl. [Docket No. 58] ¶¶ 55, 56.  Through a

number of processes, circuitry is deposited in layers upon the wafer.  Id.  ¶¶ 55–61.  Depending

on the size of the wafer and the circuitry, hundreds of identical units of circuitry are built on the

wafer.  Mundy Decl. [Docket No. 18] ¶ 5.  These individual units are called "die."  Id. ¶ 6.  After

the die have been fabricated, they are sliced into pieces and may later be packaged into "chips"

for use in semiconductor devices.  Id. ¶ 7.  Although the die are fabricated together and are

designed to be identical, given the complex fabrication process, some die will have abnormal

variations that lead to failure or unacceptable performance that render them defective.  Id. ¶¶ 7–9.

It is economically advantageous to detect any defective die before they are completed into chips.

Id. ¶ 10.

Semiconductor inspection processes predate the '298 Patent.  Mellor Decl. ¶ 64.  At the

advent of semiconductor fabrication, humans would visually inspect semiconductors using

microscopes.  '298 Patent 3:11–13; Mundy Decl. ¶ 11; Mellor Decl. ¶ 65.  Automated inspection

devices later reached the market.  Mellor Decl. ¶ 66.  These early automated optical inspection

systems performed in a staccato like fashion:  wafers were first moved into position under a

camera, were stopped, an image was taken, the wafer was moved to the next position, stopped again, and the process repeated until the entire wafer was inspected. Mundy Decl. ¶ 13. While these systems outperformed manual inspections, considerable time was spent stopping and starting the wafer. Id. ¶ 14.

The '298 Patent embodies an invention that is able to inspect wafers under movement, eliminating the starting and stopping constraint of predecessor systems. Id. ¶ 17. Rudolph asserts the '298 Patent "revolutionized" the semiconductor inspection market by increasing both the rate and accuracy of wafer inspection. Compl. ¶ 6.

## B. Prior Litigation

### 1. 2004 Infringement Suit

In 2004, Camtek introduced its Falcon line of inspection systems in the United States. Id. ¶ 8. On July 14, 2005, August Technology Corporation, which was later purchased by Rudolph, sued Camtek, alleging that the Falcon system infringed on the '298 Patent. Id. ¶ 9; August Tech. Corp. v. Camtek, Ltd., No. 05-1396 (JRT/FLN) (the "Falcon Lawsuit"). In March 2009, a jury determined that Camtek had literally infringed claims 1 and 3 of the '298 Patent. See Falcon Lawsuit Special Verdict Form [Docket No. 466]. On August 28, 2009, United States District Judge Michael J. Davis[1] permanently enjoined Camtek from "making, using, selling, and offering to sell any of its Falcon machines and any machines that are colorable imitations thereof in the United States until the expiration of the ['298] Patent." Falcon Lawsuit Order Final J. Inj. Relief [Docket No. 547] 7.

---

[1] Judge Davis presided over the Falcon Lawsuit until it was reassigned to United States District Judge John R. Tunheim on April 10, 2012. See Falcon Lawsuit Text-Only Entry [Docket No. 773].

Camtek's appeal of the Falcon Lawsuit judgment resulted in the Federal Circuit vacating the judgment and the permanent injunction, and remanding for further proceedings with an amended claim construction.  See August Tech. Corp. v. Camtek, Ltd., 655 F.3d 1278, 1281 (Fed. Cir. 2011).  Following remand, on March 31, 2014, Judge Tunheim entered summary judgment in favor of Rudolph on the issue of infringement.  Falcon Lawsuit Mem. Op. Order [Docket No. 964] ("March 31, 2014 SJ Order").  On February 9, 2015, Camtek was enjoined from "making, using, selling, and offering to sell any of its Falcon machines and any machines that are colorable imitations thereof in the United States, **intended for sale and use within the United States**, until the expiration of the ['298 Patent]."[2]  Falcon Lawsuit Mem. Op. Order [Docket No. 1010] 25; August Tech. Corp. v. Camtek, Ltd., No. 05-1396, 2015 WL 520546, at *11 (D. Minn. Feb. 9, 2015) (emphasis in original).  Judge Tunheim's February 9, 2015 Order is presently on appeal to the Federal Circuit.  See Rudolph Techs., Inc. v. Camtek, Ltd., No. 15-1434 (Fed. Cir.).  According to Rudolph, after final judgment was entered, Camtek issued a press release that it had ceased sales of the Falcon product line.  Compl. ¶ 24.

**2. 2011 Infringement Suit**

On December 27, 2011, Rudolph brought a second infringement suit against Camtek, this time alleging Camtek was infringing United States Patent No. 7,729,528 by "selling and/or offering for sale the Falcon, Gannet and Condor products."  August Tech. Corp. v. Camtek Ltd., No. 11-3707 (JRT/TNL) Compl. [Docket No. 1].  That case has been stayed pending *inter partes reexamination* of the patent at issue by the United States Patent and Trade Office.  See, e.g., id.

---

[2] The contempt sanction against Camtek was also vacated in light of a recent ruling from the Federal Circuit.  Falcon Lawsuit Mem. Op. Order at 22–23; August Tech. Corp., 2015 WL 520546, at *11.

[Docket Nos. 42, 45, 48, 51].

### 3. Fees Lawsuit

On November 1, 2010, Fish & Richardson P.C., defense counsel in the Falcon Lawsuit, sued Camtek to collect legal fees. Fish & Richardson P.C. v. Camtek, Ltd., No. 10-4436 (JRT/JJG) ("Fish & Richardson Lawsuit"). Fish & Richardson alleged Camtek failed to pay $2,206,153.81 in legal fees. Fish & Richardson Lawsuit Compl. [Docket No. 1]. Camtek counterclaimed for breach of contract and breach of fiduciary duty. Fish & Richardson Lawsuit Am. Answer Countercl. [Docket No. 57]. The parties agreed to a stipulated dismissal on July 18, 2012.

## C. Present Case

In December 2014, Camtek announced the first sale of its new Eagle semiconductor inspection system. Compl. ¶ 25. Rudolph believes the sale is to a United States customer. Id. Rudolph filed this lawsuit (the "Eagle Lawsuit") three months later.

Rudolph avers that the Eagle system infringes the '298 Patent. Rudolph bases this allegation on the Eagle's marketing materials and other publicly-available information suggesting that the Eagle is compatible with the Falcon product line. Id. ¶ 28. According to Rudolph, these marketing materials "either directly or by reasonable inference indicate that Camtek performs the steps at least of claim 3 of the ['298 Patent] with the EAGLE and that the EAGLE has the elements claim in claim 1 of the ['298 Patent]." Id.

## D. Procedural History

On April 20, 2015, Camtek filed the present Motion to Dismiss and Rudolph filed its Motion for Preliminary Injunction. On April 22, 2015, Camtek filed an Emergency Motion to

Stay Proceedings on Plaintiff's Motion for a Preliminary Injunction [Docket No. 28]. Camtek argued that since the Court lacked personal jurisdiction, it should not be required to brief the preliminary injunction motion while the motion to dismiss was pending. On April 27, 2015, Rudolph filed a Motion to Expedite Discovery [Docket No. 39]. Rudolph argued that it should be permitted limited discovery related to its preliminary injunction motion and Camtek's motion to dismiss. For reasons stated at the May 1, 2015 hearing, Camtek's Motion to Stay and Rudolph's Motion to Expedite Discovery were denied. See Order [Docket No. 51].

Now ripe for adjudication are Camtek's motions to dismiss and strike, and Rudolph's motion for a preliminary injunction. Camtek argues that this case should be dismissed because the Court lacks personal jurisdiction. Rudolph disagrees, arguing that it is entitled to a preliminary injunction enjoining Camtek from selling its Eagle product line in the United States during the pendency of this lawsuit. Camtek, in addition to arguing against the preliminary injunction motion on the merits, argues that certain materials Rudolph incorporates into its reply memorandum supporting its preliminary injunction motion should be stricken.

## III. DISCUSSION

### A. Motion to Dismiss

Camtek argues that dismissal is warranted under Rule 12(b)(2) because the Court lacks personal jurisdiction. Camtek contends the Complaint fails to allege facts that show any connection of the Eagle to Minnesota. Rudolph responds that jurisdiction here is conferred by Camtek's litigation history in this district, the similarity of the Eagle to the Falcon, and Camtek's efforts to sell the Eagle in Minnesota.

### 1.  Standard of Review

"Federal Circuit law governs the issue of personal jurisdiction in . . . patent-related cases." Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found., 297 F.3d 1343, 1348 (Fed. Cir. 2002); see also Avocent Huntsville Corp. v. Aten Int'l Co., 552 F.3d 1324, 1328 (Fed. Cir. 2008) ("[W]e apply Federal Circuit law because the jurisdictional issue is 'intimately involved with the substance of the patent laws.'"(internal quotation marks omitted)).  "[W]here the district court's disposition as to the personal jurisdiction question is based on affidavits and other written materials in the absence of an evidentiary hearing, a plaintiff need only to make a prima facie showing that defendants are subject to personal jurisdiction."  Elecs. for Imaging, Inc. v. Coyle, 340 F.3d 1344, 1350 (Fed. Cir. 2003).  When evaluating a motion to dismiss for lack of personal jurisdiction when no evidentiary hearing has occurred, as is true here, the court "accepts uncontroverted allegations in the complaint as true and resolves factual disputes in the [plaintiff's] favor."  AFTG–TG, LLC v. Nuvoton Tech. Corp., 689 F.3d 1358, 1360 (Fed. Cir. 2012).

### 2.  Personal Jurisdiction

When a federal court assesses whether it has personal jurisdiction over an out-of-state defendant, it must evaluate:  (1) whether a forum state's long-arm statute permits service of process and (2) whether maintaining personal jurisdiction over the defendant would violate due process.  Genetic Implant Sys., Inc. v. Core–Vent Corp., 123 F.3d 1455, 1458 (Fed. Cir. 1997). Since Minnesota applies its long-arm statute to the fullest extent permissible under due process, the two requirements collapse into a single inquiry.  Minn. Stat. § 543.19; see also Valspar Corp. v. Lukken Color Corp., 495 N.W.2d 408, 411 (Minn. 1992).  Therefore, the only determination is whether the exercise of personal jurisdiction here is consistent with federal due process.  3D Sys.,

Inc. v. Aarotech Labs., Inc., 160 F.3d 1373, 1377 (Fed. Cir. 1998).

Due process "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which [he or she] has established no meaningful contacts, ties, or relations." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471–72 (1985) (citation and quotation marks omitted). To satisfy due process, the defendant must have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Avocent Huntsville Corp., 552 F.3d at 1329 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). Under that framework, the Federal Circuit has drawn a distinction between "general" personal jurisdiction and "specific" personal jurisdiction. Trinitec Ind., Inc. v. Pedre Promotional Prods., Inc., 395 F.3d 1275, 1279 (Fed. Cir. 2005). "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." Goodyear Dunlop Tires Operations, S.A. v. Brown, ⸺ U.S. ⸺, ⸺, 131 S.Ct. 2846, 2851 (2011) (quoting Int'l Shoe Co., 326 U.S. at 317). Specific jurisdiction is satisfied when "the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." Burger King Corp., 471 U.S. at 472.

Camtek argues that Rudolph has failed to make a prima facie showing of either general or specific personal jurisdiction. Rudolph concedes that it has not made a showing of general personal jurisdiction but argues that it has alleged sufficient facts to establish specific personal jurisdiction over Camtek. Specifically, Rudolph cites Camtek's litigation history in Minnesota, the sale of closely related infringing products in Minnesota, and Camtek's efforts to sell the Eagle

product in Minnesota.  Camtek responds that the Complaint does not plead facts showing infringement relating to the Eagle product in Minnesota and therefore specific personal jurisdiction is lacking.

The Federal Circuit applies a three part test for specific jurisdiction.  "To determine whether [specific] jurisdiction over any out-of-state defendant comports with due process, we look to whether (1) the defendant purposefully directed its activities at residents of the forum state, (2) the claim arises out of or relates to the defendant's activities with the forum state, and (3) assertion of personal jurisdiction is reasonable and fair."  Elecs. For Imaging, Inc., 340 F.3d at 1350.  "The first two factors correspond with the 'minimum contacts' prong of the International Shoe analysis, and the third factor corresponds with the 'fair play and substantial justice' prong of the analysis."  Autogenomics, Inc. v. Oxford Gene Tech. Ltd., 566 F.3d 1012, 1019 (Fed. Cir. 2009) (quoting Inamed Corp. v. Kuzmak, 249 F.3d 1356, 1360 (Fed. Cir. 2001)).  "The plaintiff has the burden of proving parts one and two of the test, and then the burden shifts to the defendant to prove that personal jurisdiction is unreasonable."  Grober v. Mako Prods., Inc., 686 F.3d 1335, 1346 (Fed. Cir. 2012).

### a.  Purposefully directed activities

Camtek argues that because the Complaint alleges that Camtek directed its activities regarding the Eagle at the entire United States and not Minnesota, Rudolph cannot satisfy the first prong.  Rudolph submits that Camtek's litigation history in Minnesota and its marketing efforts within Minnesota satisfies this factor.

"'Minimum contacts' requires that a defendant has 'purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefits and

protections of its laws.'" Viam Corp. v. Iowa Exp.-Imp. Trading Co., 84 F. 3d 424, 428 (Fed. Cir.

1996) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).  Applying this principle, courts

have exercised jurisdiction against foreign defendants based on that party's litigation history in

the district.  See, e.g., Cognex Corp. v. Vcode Holdings, Inc., No. 6-1040, 2006 WL 3043129, at

*12 (D. Minn. Oct. 24, 2006) (holding litigation activity of alter ego established basis for specific

personal jurisdiction for parent corporation).  In Huff v. Pharr, the plaintiff sued a Florida resident

defendant in California state court in 1972.  748 F.2d 1553, 1554 (11th Cir. 1984).  The defendant

counterclaimed and defended on the merits and eventually suffered an adverse judgment, which

was affirmed by the California Court of Appeals in 1977.  Id.  The defendant, however, did not

pay the judgment.  In 1982, the plaintiff sued in California to renew the judgment, which was

granted by default after the defendant failed to appear.  Id.  Only after the plaintiff sought to

enforce the judgment in United States District Court for the Middle District of Florida did the

defendant resist, collaterally attacking the jurisdiction of California.  Id.  In holding that the

defendant had the requisite minimum contacts with California to exercise jurisdiction over the

1982 action, the Eleventh Circuit relied on the defendant's counterclaim and appeal to the state

appellate court.  Id. at 1555.

Mattell, Inc. v. Greiner and Hausser GmbH is helpful to the analysis here.  In that case, a

German defendant asserted a patent infringement claim against the plaintiff in federal district

court in California in 1961, which was settled and dismissed in 1964.  354 F.3d 857, 859 (9th Cir

2003).  Forty years later, in 2001, the defendant filed a lawsuit in Germany, claiming that it had

been defrauded when it entered into the 1964 settlement agreements.  Id.  Shortly after the lawsuit

in Germany was filed, the plaintiff filed suit in California seeking to "enforce" the resolution of

the 1961 lawsuit.  Id.  The defendant's motion to have the case dismissed on jurisdictional

grounds was denied.  In so deciding, the Ninth Circuit held that under the reasoning of Thompson

v. Thompson, 798 F.2d 1547, 1549 (9th Cir. 1968) aff'd 484 U.S. 174 (1988), the German

defendant had "purposefully availed itself of the privilege of conducting activities in California

when it filed the lawsuit [ ] in 1961."  Id. at 863.

       While being named as a defendant does not necessarily invoke the benefits and

protections of the forum's laws for jurisdictional purposes, asserting claims in the forum state can.

Compare Hanson, 357 U.S. at 253–54 ("[U]nilateral activity of those who claim some

relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum

State."), with Viam Corp., 84 F.3d at 430 (finding jurisdiction where "according to their own

submission to this court, [the defendants] have initiated a suit seeking to enforce the same patent

that is the subject of this suit against other parties, unrelated to this action, in the same district

court.").

       Camtek has been named as a defendant in Minnesota Federal District Court in three

separate cases related to the '298 Patent.  Rudolph has also twice sued Camtek in Minnesota

Federal District Court for infringing a different patent related to wafer inspection.  In two of the

three cases related to the '298 Patent, Camtek asserted counterclaims.  In the Falcon Lawsuit,

Camtek counterclaimed for declaratory judgment of noninfringement, unenforceability, and

invalidity of the '298 Patent.  See Falcon Lawsuit Second Am. Answer Am. Compl. Countercl.

[Docket No. 202].  At least the invalidity counterclaim is a permissive claim.  See Ecolab, Inc. v.

Paraclipse, Inc., 285 F.3d 1362, 1376 (Fed. Cir. 2002) (reversing district court and permitting

defendant to challenge the validity of the patent-at-issue in a new trial despite not doing so in the

first trial).  By their nature, permissive counterclaims are discretionary; whether to assert such a

claim is up to the party.  6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal</u>

<u>Practice and Procedure</u> § 1420 (3d 2015).

This lawsuit is not an "enforcement" action as in <u>Mattell</u>, or a renewal of judgment action

as in <u>Huff</u>, but does "involve a claim uniquely connected with [Camtek's ] previous forum-related

activities."  <u>Huff</u>, 748 F.2d at 1555.  Notably, this lawsuit and the Falcon Litigation involve the

same patent, the same claims, and, as averred in the Complaint, a product that does not "omit[ ]

any functionality of the infringing FALCON machines" and that "is compatible with the

FALCON product line."  Compl. ¶ 28.  Significantly, unlike the two lawsuits in <u>Mattell</u>, the

Falcon Lawsuit is still active, with Camtek filing its appeal on March 9, 2015.  In filing its

permissive counterclaim in the Falcon Litigation, Camtek voluntarily "availed [itself] of the

privilege of conducting activities within the forum state, thus invoking the benefits and

protections of its laws."  <u>Viam Corp.</u>, 84 F. 3d at 428.

Additionally, Camtek's marketing presentations in Minnesota further support a finding

that Camtek purposefully directed activities at Minnesota.  Camtek admits that Bill Hanna

("Hanna"), the President and Chief Sales Consultant for ViaTec Sales & Marketing LLC

("ViaTec"), made two presentations about the Eagle to customers in Minnesota.[3]  Hanna Decl.

---

[3] ViaTec  is an independent contractor of Camtek USA.  Hanna Decl. ¶ 7.  Camtek USA is Camtek's wholly-owned subsidiary in the United States.  Compl. ¶ 3; Weiss Decl. [Docket No. 23] ¶ 3.  Camtek USA contracts with ViaTec for Eagle sales.  <u>Id.</u> ¶ 8.  Hanna's activities (as president and chief sales consultant for ViaTec) are relevant to whether Camtek is subject to specific personal jurisdiction in Minnesota.  <u>See</u> <u>Asahi Metal Indus. Co., Ltd. v. Superior Court of Cali., Solano Cnty.</u>, 480 U.S. 102, 112 (1987) ("Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, . . . marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.") (opinion of O'Connor, J.)

[Docket No. 22] ¶¶ 1, 8.  Although an Eagle system was not physically present at either of these presentations, Hanna states he provided information about the Eagle, discussed customer needs, and answered questions about how the Eagle works.  Id. ¶¶ 8–10.

Participating in trade shows to market allegedly infringing products may satisfy the "purposefully directed activities" element of specific personal jurisdiction.  For example, in Elan Microelectronics Corp. v. Pixcir Microelectronics Co. Ltd., an executive of the defendant company traveled to the forum state to attend a consumer trade show in Las Vegas.  No. 10-14, 2012 WL 523695, at *2 (D. Nev. Feb. 16, 2012).  In that case, the defendant company did not have a booth at the trade show and the executive stayed for only two hours, engaging in "social" or "casual" discussions with two potential customers.  Id. at *4.  While a prototype of the allegedly infringing product was shipped for use at the trade show, it was not displayed or discussed during the executive's conversations.  Id.  The district court concluded that the executive's "admissions regarding his activities in Las Vegas support a finding that [the defendant] purposefully directed its activities at parties in the District of Nevada during [the trade show]."  Id. at *6–7.  Notably, the prototype's presence in the forum state was immaterial to the court's analysis, and the activities at the trade show were sufficient to establish personal jurisdiction under either a prima facie standard or the higher preponderance of the evidence standard.  Id. at *7.

Here, Hanna's presentations in Minnesota support the same conclusion.  First, unlike the inherent passivity of a booth at a trade show, Hanna's presentations were given to a group of potential customers who attended for the explicit purpose of learning about the Eagle.  While Hanna does not identify how many customers were present or for how long the presentations

13

lasted, the presentations were very likely more significant than the social or casual conversations in Elan Microelectronics.  Second, Hanna is ViaTec's President and Chief Sales Consultant, and ViaTec is paid by Camtek USA on commission.  This suggests that the primary motivation for the presentations were to generate customer interest in the Eagle.  Camtek does not offer any alternative reason why the audience attended the presentations other than their potential interest in purchasing an Eagle.  Finally, as in Elan Microelectronics, simply because the Eagle system itself was not physically present in Minnesota does not preclude a finding of specific personal jurisdiction.  While the question would be more easily resolved if an Eagle had landed in Minnesota, presence of the accused device in the forum state is not required.

### b.  Claim arises out of or relates to Camtek's activities in Minnesota

The second inquiry is whether the claim arises out of or relates to the activities in Minnesota.  Elecs. for Imaging, Inc., 340 F.3d at 1350.  Camtek argues that because patent infringement under 35 U.S.C. § 271(a) requires Camtek to sell or offer to sell the Eagle, Rudolph must demonstrate such events took place in Minnesota.  Camtek contends there is no evidence that the Eagle system has ever been sold or offered for sale in Minnesota.  Rudolph counters that Hanna's two customer presentations and Camtek's public statements regarding its aggressive marketing strategy support a determination that this factor favors Rudolph.  The Court again agrees with Rudolph.

The Federal Circuit defines "§ 271(a)'s 'offer to sell' liability according to the norms of traditional contractual analysis."  Rotec Indus., Inc. v. Mitsubishi Corp., 215 F.3d 1246, 1254–55 (Fed. Cir. 2000).  "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will

conclude it." Restatement (Second) of Contracts § 24 (1981). Although the Federal Circuit has

ruled that a price term is a necessary ingredient to constitute an "offer to sell," "[o]ne of the

purposes of adding 'offer [ ] to sell' to section 271(a) was to prevent . . . generating interest in a

potential infringing product to the commercial detriment of the rightful patentee." MEMC Elec.

Materials, Inc. v. Mitsubishi Materials Silicon Corp., 420 F.3d 1369, 1376 (Fed. Cir. 2005)

(quoting 3D Sys., Inc., 160 F.3d at 1379).

    In C.R. Daniels, Inc. v. Naztec Intern. Group, LLC, No. 11-1624, 2011 WL 6026293 (D.

Md. Dec. 2, 2011), representatives for the defendant company attended a trade show and

displayed the allegedly infringing products to interested customers. Id. at *2. Although the

representatives "rarely talk[ed] about prices with potential customers"—indeed "it would have

been impossible [ ] to initiate an actual transaction at the conference" because "none of the

attendees had authority to purchase the [product] at the Conference"—the district court concluded

that the allegedly infringing product was offered for sale in the forum state. Id. at *2, *7. In so

holding, the C.R. Daniels court balanced the Federal Circuit's general requirement of a price term

being necessary to constitute an offer to sell with their desire to remain flexible and prevent

"generating interest in a potential infringing product to the commercial detriment of the rightful

patentee." Id. at *12 (quoting 3D Sys., Inc., 160 F.3d at 1379). The nature of the product and the

common practice to market products at the trade show and await calls from interested customers

following the conference led the court to conclude the "offer to sell" requirement was satisfied.

"[I]t 'strain[s] credulity' to conclude that [the defendant] did not attend the Conference in order to

'offer to sell' its allegedly infringing [product]." C.R. Daniels, 2011 WL 6026293, at *12–13

(alteration in original).

Although price terms allegedly were not discussed, Hanna's presentations were sales pitches, intended to generate customer interest and potential future sales.  Unlike HollyAnne Corp. v. TFT, Inc., a case cited by Camtek, the audiences of Hanna's presentations were prospective customers.  199 F.3d 1304, 1309 (Fed. Cir. 1999).  Also unlike Moldflow Corp. v. Simcon, Inc., the presentations at issue here were fluid and interactive, vastly different than the "flyers" that were used in that case to conclude that no offer was made.  296 F. Supp. 2d 34, 44 (D. Mass 2003).  It is reasonable to conclude at this juncture that Hanna's presentations were more than informational sessions lacking any commercial intent.  Like C.R. Daniels, the presentations were designed to generate interest in the Eagle and produce future sales.  Also similar to C.R. Daniels, the record reflects that Eagle systems are not typically purchased on the spot without due consideration.  Indeed, a recent sale of an Eagle system was made after a run-off evaluation between Rudolph and Camtek that lasted from June to November.  Voots Decl. [Docket No. 16] ¶ 30.  Sales of these sophisticated, technical products take significant time to progress to a final decision to purchase and presentations like Hanna's in Minnesota are part of the process.  This squarely fits within the "generating interest in a potential infringing product to the commercial detriment of the rightful patentee" definition that § 271(a)'s "offer [ ] to sell" language was aimed at preventing.  3D Sys., Inc., 160 F.3d at 1379.  Rudolph's infringement claim arises out of Camtek's activities in Minnesota.

### c.  Reasonable and fair

The final factor is whether the exercise of specific personal jurisdiction over Camtek would be reasonable and fair.  Five factors are considered in making this determination:  "(1) the burden on the defendant, (2) the forum's interest in adjudicating the dispute, (3) the plaintiff's

interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest of obtaining the most efficient resolution of controversies, and (5) the shared interest of the states in furthering fundamental substantive social policies." Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico, 563 F.3d 1285, 1299 (Fed. Cir. 2009).

None of the factors caution against exercising jurisdiction over Camtek. Defending against lawsuits in foreign courtrooms is burdensome. However, Camtek has not identified any salient reason why Minnesota is particularly troubling. Moreover, Camtek has been defending itself in this district for over a decade. Any burden is also outweighed by Minnesota's interest in adjudicating this dispute. Although Rudolph's principal place of business is not located in Minnesota, it does have a physical presence in this state. Furthermore, judges in this district have already made findings regarding the '298 Patent, including construing claim terms and making invalidity determinations. See generally Falcon Lawsuit. Although other districts would clearly be able to access this information, the parties' litigation history signals they are familiar with this district's general local rules and local rules regarding patent cases. While perhaps optimistic considering the Falcon Lawsuit has been in litigation for over 10 years, this familiarity may expedite this dispute and allow for an efficient resolution. In short, there is no good reason why asserting jurisdiction here would not comport with fair play and substantial justice.

## B. Motion to Strike

Camtek contests two declarations Rudolph submitted with its reply memorandum supporting its motion for a preliminary injunction. Camtek argues that the supplemental declarations of Rudolph's technical expert, Joseph L. Mundy [Docket No. 66], and Rudolph's damages expert, Frances M. McCloskey [Docket No. 69], violate Local Rule 7.1 because they

each introduce new expert theories that were not raised in their initial moving papers.  Rudolph

counters that the supplemental declarations directly reply to Camtek's opposition brief and do not

advance any new theories, therefore complying with the local rules.

Local Rule 7.1(c)(3)(B) states "[a] reply memorandum must not raise new grounds for

relief or present matters that do not relate to the opposing party's response."  L.R. 7.1(c)(3)(B).

The rule does permit arguments in reply memoranda that rebut to the opposing party's response.

ARA, Inc. v. Barnes Pers, Mgmt., Inc., No. 12-2812, 2014 WL 3748633, at *8 n.9 (D. Minn. July

30, 2014).

Contrary to Camtek's position, the supplemental declarations do not raise new grounds for

relief or present arguments that are unrelated to Camtek's opposition papers.  After reviewing

both declarations and focusing on the specific sections Camtek identified as running afoul of the

Local Rules, the Court finds no violations of Local Rule 7.1.  The declarations support Rudolph's

position by either reaffirming their initial opinions or attacking the conclusions of Camtek's

experts.  Camteks's Motion to Strike is denied.

## C.  Motion for a Temporary Restraining Order

### 1.  Legal Standard

Rudolph requests a preliminary injunction restraining Camtek from selling the Eagle in

the United States pending trial.  A preliminary injunction is "an extraordinary remedy that may

only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Nat.

Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).  As the moving party, Rudolph must demonstrate:

> (1) the movant has some likelihood of success on the merits of the underlying
> litigation; (2) immediate irreparable harm will result if the relief is not granted;
> (3) the balance of hardships to the parties weighs in the movant's favor; and (4)
> the public interest is best served by granting the injunctive relief.

Abbott Labs. v. Andrx Pharm., Inc., 452 F.3d 1331, 1334 (Fed. Cir. 2006) (quoting Polymer Techs., Inc. v. Bridwell, 103 F.3d 970, 973 (Fed. Cir. 1996)). "All findings of fact and conclusions of law at the preliminary injunction stage are subject to change upon the ultimate trial on the merits." Jack Guttman, Inc. v. Kopykake Enters., Inc., 302 F.3d 1352, 1361 (Fed. Cir. 2002) (quoting Purdue Pharma L.P. v. Boehringer Ingelheim GmbH, 237 F.3d 1359, 1363 (Fed. Cir. 2001)). "The grant or denial of a preliminary injunction under 35 U.S.C. § 283 is within the sound discretion of the district court." Abbott Labs., 452 F.3d at 1334. "A request for a preliminary injunction is evaluated in accordance with a 'sliding scale' approach:  the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction." Eskridge Research Corp. v. United States, 92 Fed. Cl. 88, 96 (Fed. Cl. 2010) (quoting Qingdao Taifa Grp. Co., Ltd. v. U.S., 581 F.3d 1375, 1378–79 (Fed. Cir. 2009)).

### 2. Success on the Merits

Rudolph argues that it will likely prove the Eagle infringes at least claim 1 of the '298 Patent.  Claim 1 of the '298 Patent recites:

> 1.  An automated system for inspecting a substrate such as a wafer in any form including whole patterned wafers, sawn wafers, broken wafers, and wafers of any kind on film frames, dies, die in gel paks, die in waffle paks, multi-chip modules often called MCMs, JEDEC trays, Auer boats, and other wafer and die package configurations for defects, the system comprising:
>
> > a wafer test plate;
> >
> > a wafer provider for providing a wafer to the test plate;
> >
> > a visual inspection device for visual inputting of a plurality of known good quality wafers during training and for visual inspection of other unknown quality wafers during inspection;

at least one of a brightfield illuminator positioned approximately above, a darkfield illuminator positioned approximately above, and a darkfield laser positioned approximately about the periphery of the wafer test plate, all of which are for providing illumination to the unknown quality wafers during inspection and at least one of which strobes to provide short pulses of light during movement of a wafer under inspection based on a velocity of the wafer; and

a microprocessor having processing and memory capabilities for developing a model of good quality wafer and comparing unknown quality wafers to the model.

'298 Patent 20:55–21:12.  Although Rudolph admits it did not physically inspect an Eagle, it argues that marketing materials sufficiently show the Eagle's functionality for its experts to opine that the Eagle infringes the '298 Patent.  Camtek disagrees, arguing that Rudolph's conclusions are erroneous because they are based on incorrect assumptions about the Eagle's functionality and its relatedness to the Falcon.  Camtek argues that if Rudolph had actually inspected an Eagle it would have learned that the Eagle functions in an entirely unique manner and that the Eagle and the Falcon are birds of a different feather.

"To establish entitlement to a preliminary injunction a movant must establish a reasonable likelihood of success on the merits."  Somerset Pharm., Inc. v. Dudas, 500 F.3d 1344, 1346 (Fed. Cir. 2007) (citing Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir. 2004)).  "To prove likelihood of success on the merits, a patentee must prove that success in establishing infringement is 'more likely than not.'"  Trebro Mfg., Inc. v. Firefly Equip., LLC, 748 F.3d 1159, 1166 (Fed. Cir. 2014) (quoting Revision Military, Inc. v. Balboa Mfg. Co., 700 F.3d 524, 525–26 (Fed. Cir. 2012)).  Determining whether a patent is infringed is a two step process.  "First, the court determines the scope and meaning of the patent claims asserted . . . . [Second,] the properly construed claims are compared to the allegedly infringing device."  Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc) (citations omitted).

Step two "requires a determination that every claim limitation or its equivalent be found in the accused device." Oakley, Inc. v. Sunglass Hut Intern., 316 F.3d 1331, 1339 (Fed. Cir. 2003).

### a. Claim Construction

The determination of the likelihood of success on the merits factor is greatly assisted by the claim constructions of the district court and the Federal Circuit in the Falcon Litigation.[4] Relevant for purposes here are the constructions of "wafer," "unknown quality wafer," "plurality of known good quality wafers/multiple known good wafers," and "training."

The term "wafer" was construed by the Federal Circuit to mean:

> [A] thin, discrete slice of semiconductor material with circuitry thereon that is ready for electrical testing having one or more dies. A plurality of wafers means more than one physically distinct wafer.

August Tech. Corp., 655 F.3d at 1286. Under this construction, "wafer" can include "a whole wafer, a discrete portion of a wafer (a sawn wafer or a broken wafer), and even a discrete physical substrate that includes only an individual die." Id. at 1285. "A plurality of wafers" was construed to mean "more than one physically distinct wafer." Id. at 1286. "Unknown quality wafer" was construed to mean "[w]afers for which the location of one or more defects, if any, is not identified or ascertained prior to inspection." March 31, 2014 SJ Order 7. This construction was not challenged on appeal. "Plurality of known good quality wafers/multiple known good wafers" was construed to mean "[m]ultiple 'wafers' that are recognized individually or as a whole to be sufficiently free of defects for training purposes (e.g. die that have been inspected, tested, or otherwise reviewed prior to or during training)." Id.; August Tech. Corp. v. Camtek, Ltd., 534 F.

---

[4] Camtek has sought appeal of the District Court's interpretation of the Federal Circuit's claim construction. See Rudolph Tech., Inc. v. Camtek, Ltd., No. 15-1434 (Fed. Cir. 2015) Br. [Docket No. 18] 20–21.

Supp. 2d 969, 974–75 (D. Minn. 2008) ("Markman Order").  Finally, "training" was construed to

mean "examining wafers to develop a model of a good quality wafer."  Markman Order at 978.

This construction was not altered on appeal.

### b.  Analysis

Camtek argues that the Eagle does not infringe on what Rudolph designates elements

three, five, and six of claim 1.  Because the Court finds that Rudolph has not shown it is more

likely than not that the Eagle infringes on element three, and all elements of the claim must be

present for infringement, elements five and six will not be discussed here.  See Trebro Mfg., Inc.,

748 F.3d at 1166 ("To prove an accused product literally infringes the patent in suit, the product

must contain each and every limitation of the asserted claim(s).").

Element three recites:

> a visual inspection device for visual inputting of a plurality of known good quality
> wafers during training and for visual inspection of other unknown quality wafers
> during inspection.

'298 Patent 20:64–67.  To show the Eagle satisfies this element, Rudolph must demonstrate that

the Eagle is capable of inputting a plurality of known good quality wafers during training.  See

Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1204 (Fed. Cir. 2010) ("[T]o infringe a

claim that recites capability and not actual operation, an accused device need only be capable of

operating in the described mode.  Thus, depending on the claims, an accused device may be found

to infringe if it is reasonably capable of satisfying the claim limitation, even though it may also be

capable of noninfringing modes of operation."  (internal citation and quotation marks omitted)).

Camtek argues that the Eagle does not meet this claim limitation because the Eagle does not input

a plurality of known good quality wafers during training.  According to Camtek, the Eagle

"trains" by selecting die of unknown quality to create what Camtek refers to as the "golden die," "a visual representation of an 'ideal' or 'golden die.'" Langer Decl. [Docket No. 59] ¶ 16.

The Falcon system trained using a similar procedure.  However, the Falcon had an operational mode called Adjust to Gold, which "updated" the golden die inspection parameters after each discrete wafer was inspected.  March 31, 2014 SJ Order 30–32.  While Camtek argued this "updating" was not "training," as that term was construed, the district court disagreed, stating that "[t]he process of creating inspection parameters is thus integral to creating a model of a good quality wafer, because the process identified acceptable variations that will be allowed during inspection."  Id. at 32–33.  Thus, the district court rejected Camtek's argument and concluded the Falcon trained using a plurality of wafers.

Here, Camtek asserts the Eagle does not have the Adjust to Gold operational mode of the Falcon.  Instead, the Eagle has a default mode and a "Recreate" or "Clean Reference" option.  Mellor Decl. ¶ 132.  In the default mode, "a golden die is created using die from a single wafer followed by comparing die from all wafers of the same type to the golden die."  Id.  Using the Recreate or Clean Reference option:

> after the original die is created using a die from a single wafer, the Eagle will create a totally new golden die later in the process, either:
>     a. **Every Wafer**:  every time a new wafer is loaded, a new golden die is created using die from that single wafer followed by comparing the die from that same single, new wafer to the golden die for that wafer;
>     b. **Every Lot**:  every time inspection of a new lot begins, a new golden die is created using die from a single wafer (the first in the lot) followed by comparing the die from that same single, new wafer and all other wafers in the lot to the golden die for that lot.

Id.  Both the default mode and the Recreate or Clean Reference option describe training modes that are distinct from the Adjust to Gold option the Falcon performed.  Unlike Adjust to Gold, the

Eagle's operational modes create the golden die from one discrete wafer.  After the golden die is created, it is not "updated" using subsequent wafers.  Dr. Mellor states that the Eagle creates the golden die by using a number of randomly selected die of unknown quality.  Mellor Decl. ¶ 152. Importantly, "[t]he golden die is created using a number of die <u>which come exclusively from the currently loaded wafer</u>."  <u>Id.</u> (emphasis added).  In the March 31, 2014 SJ Order, the district court stated:

> What the Federal Circuit <u>did</u> hold, is that in order to have the multiple wafers necessary to constitute infringement of the training claims, the Falcon must perform its operations on multiple discrete wafers - even if on those wafers it performs the operations with respect to only a single die - not multiple die contained on the same wafer.

March 31, 2014 SJ Order 25–26 (emphasis in original).  The operational modes of the Eagle do not satisfy the Federal Circuit's requirement; the golden die is created from a single wafer, not a plurality of wafers.  While Rudolph's expert contends that an operator of the Eagle is able to make adjustments to the inspection parameters as additional wafers are inspected, unlike the Adjust to Gold mode, the adjustments are not made by the Eagle system itself.  Rather, because these adjustments can only be performed by a person, it is uncertain if the Eagle is training using a plurality of wafers since the Eagle does not "perform its operations on multiple discrete wafers." Thus, Rudolph has failed to show it is more likely than not to succeed on the merits.

Although Rudolph has not satisfied the more likely than not standard required to show infringement, this does not necessarily mean an injunction is unwarranted.  <u>See</u> <u>Momenta Pharma, Inc. v. Amphastar Pharma., Inc.</u>, 686 F.3d 1348, 1352 (Fed. Cir. 2012) (noting that if the likelihood of success on a patent infringement claim is not proven, a preliminary injunction is <u>likely</u> not appropriate) (emphasis added).  While the Court's infringement analysis has relied on

the claim construction orders in the Falcon Litigation, the question of whether the Eagle infringes the '298 Patent is close one, especially at this early state in the Eagle Litigation.  Even if the opposite conclusion was reached—that the Eagle more likely than not infringes—some showing or irreparable harm is needed prior to restraining Camtek from importing and selling the Eagle in the United States.

### 3.  Irreparable Harm

Rudolph's argument of irreparable harm without an injunction is focused on "incumbency" or vendor lock-in—the idea that customers who purchase an Eagle will be unlikely to switch to a Rudolph product because of the substantial switching costs.  This incumbency, argues Rudolph, allows Camtek to take market share and customers that Rudolph will be unlikely to recover for a significant amount of time, even if it ultimately secures a favorable infringement ruling.  Rudolph additionally argues that Camtek's status as the only other major United States supplier of semiconductor inspection systems means any sales of infringing Eagles are sales Rudolph would have otherwise made.  Camtek argues that any harm Rudolph may incur is not irreparable; rather, any harm can be remedied by compensatory damages.  Camtek also argues that Rudolph has failed to show a causal nexus between the alleged infringement and the alleged harm, which is also required before a preliminary injunction can issue.

As the party seeking injunctive relief, Rudolph must make a "clear showing" that it is at risk of irreparable harm.  Winter, 555 U.S. at 22.  This requires establishing "a likelihood of substantial and immediate irreparable injury."  Apple, Inc. v. Samsung Elec. Co., Ltd., 678 F.3d 1314, 1325 (Fed. Cir. 2012) ("Apple I") (quoting O'Shea v. Littleton, 414 U.S. 488, 502 (1974)).  "A preliminary injunction will not issue simply to prevent a mere possibility of injury, even

where prospective injury is great.  A presently existing actual threat must be shown."  Qingdao

Taifa Grp., 581 F.3d at 1379.  "Thus, to satisfy the irreparable harm factor in a patent

infringement suit, a patentee must establish both of the following requirements:  1) that absent an

injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal nexus relates the

alleged harm to the alleged infringement."  Apple Inc. v. Samsung Elec. Co., Ltd., 695 F.3d 1370,

1374 (Fed. Cir. 2012) ("Apple II").

        The Apple cases establish that the patentee needs to connect lost sales to the infringing

technology.  "In cases such as this—where the accused product includes many features of which

only one (or a small minority) infringe—a finding that the patentee will be at risk of irreparable

harm does not alone justify injunctive relief.  Rather, the patentee must also establish that the

harm is sufficiently related to the infringement."  Id.  "Sales lost to an infringing product cannot

irreparably harm a patentee if consumers buy that product for reasons other than the patented

feature. . . .  Thus, a likelihood of irreparable harm cannot be shown if sales would be lost

regardless of the infringing conduct."  Id. (quoting Apple I, 678 F.3d at 1324).

         In Apple II, the Federal Circuit reversed the district court's preliminary injunction order

because Apple, the patentee, failed to satisfy the nexus requirement.  695 F.3d at 1374.  The

Apple II court stressed that the causal nexus requirement "is not a true or false inquiry."  Id. at

1375.  Rather, the patentee must "show that the infringing feature drives consumer demand for

the accused product."  Id.  Thus, to establish this nexus, Rudolph must show that customers buy

the Eagle because it is equipped with the specific technology recited in Claim 1 of the '298

Patent—not because it inspects semiconductors in general.  The Federal Circuit identified ways

patentees can satisfy this showing:

> There might be a variety of ways to make this required showing, for example, with evidence that a patented feature is one of several features that cause consumers to make their purchasing decisions.  It might also be shown with evidence that the inclusion of a patented feature makes a product significantly more desirable.  Conversely, it might be shown with evidence that the absence of a patented feature would make a product significantly less desirable.

Apple Inc. v. Samsung Elec. Co., Ltd., 735 F.3d 1352, 1364 (Fed. Cir. 2013) ("Apple III").

Rudolph attempts to make such a showing by demonstrating that the '298 Patent enables inspection at significantly increased speeds and inspection speeds drive the purchase decisions of semiconductor manufacturers.  In support, Rudolph's expert states that "[h]igh throughput (the number of wafers inspected each minute) is one the most significant factors customers demand when considering a wafer inspection system."  Supp. Voots Decl [Docket No. 68] ¶ 3.  However, as Camtek stresses, Rudolph has failed to proffer any customer based evidence—either directly from a customer or in survey form—indicating that the '298 Patent influences customers' purchasing decisions or makes the product significantly more desirable.  In Apple III, the Federal Circuit remanded the nexus question to the district court for consideration of survey evidence that showed customers were willing to pay a premium price for a product that included certain utility patents.  Apple III, 735 F.3d at 1367–68.  Here, however, no such evidence exists; the only source of evidence is Rudolph's own expert.  Moreover, the products at issue are highly complex machines performing an incredibly technical task of extreme precision.  As evidenced by the Eagle's operational manual and promotional materials, these systems have numerous features permitting inspection of increasingly smaller components.  Because of this complexity, the causal nexus requirement is not easily satisfied.  See id. at 1362 ("[T]he causal nexus requirement applies regardless of the complexity of the products.  It just may be more easily satisfied (indeed, perhaps even conceded) for relatively 'simple' products.").

27

Also cutting against Rudolph's causal nexus arguments is the sizable price difference of the Eagle and Rudolph systems.  In 2014, four Eagle systems were sold to a customer in Idaho for $2.8 million.  Voots Decl. ¶ 36.  Four Rudolph systems would have cost $4.4 million.  Id.  Rudolph's expert admits price concerns play an important role in the purchase of an inspection system.  See Supp. Voots Decl. ¶¶ 3, 4 ("High throughput . . . is one of the most significant factors" and "customers consider the price of inspection systems to be important") (emphases added).  While price always influences purchasing decisions, the sizeable disparity here suggests price difference would play a significant role in the purchase decision.

Therefore, Rudolph has not made a sufficiently strong showing of irreparable harm to offset its inability to more clearly prove that the Eagle "more likely than not" infringes the '298 Patent.  See Eskridge Research Corp., 92 Fed. Cl. at 96 (explaining the "sliding scale" approach of the preliminary injunction analysis).

### 4.  Balance of Harms and Public Interest

The final two prongs of the preliminary injunction analysis are balancing the harms to the parties and considering whether the public interest would be served by issuing the injunction. These two factors are of less importance than the likelihood of success and irreparable harm factors discussed above.  Qingdao Taifa Grp., 581 F.3d at 1382.  The balance of harms factor "assesses the relative effect of granting or denying an injunction on the parties," i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 862 (Fed. Cir. 2010), and the public interest factor requires Rudolph to demonstrate that "the public interest would not be disserved by a [preliminary] injunction."  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

Neither factor weighs heavily in favor of Rudolph to support issuing a preliminary

injunction.  While Rudolph will undoubtedly suffer harm if forced to compete against a similar, perhaps infringing, product being sold at a significantly lower price, the harm Camtek will incur if completely shut out from the United States market is a greater potential harm.  See Ex. [Docket No. 14] Ex. O 8 (showing that in 2013, the United States semiconductor industry had over half the global market share).

Finally, turning to the public interest factor, the public is best served by competition in the marketplace.  Enjoining sales of the Eagle further reduces competition in an industry that only has two major players.  See Voots Decl. ¶ 10 ("It is my understanding that Rudolph and Camtek are the two major companies currently selling inspection systems to U.S.-based customers performing inspection of advanced packaging wafers.").  Eliminating Camtek from this market creates the potential for monopolistic pricing and business practices that would not be in the public's interest.

**D.  Camtek's Objection**

While the instant motions were pending, Magistrate Judge Thorson issued a Pretrial Scheduling Order [Docket No. 84] on July 23, 2015.  Camtek Objected [Docket No. 86] to the scheduling order, arguing that the personal jurisdiction question should be resolved before the court exercises authority over Camtek.  Because personal jurisdiction is proper, Camtek's Objections are overruled.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant Camtek Ltd.'s Motion to Dismiss [Docket No. 5] is **DENIED**;

2.      Defendant Camtek Ltd.'s Motion to Strike Pleading [Docket No. 75] is **DENIED**;

3.      Plaintiff Rudolph Technologies, Inc.'s Motion for Preliminary Injunction [Docket No. 6] is **DENIED**; and

4.      Defendant Camtek Ltd.'s Objection [Docket No. 86] is **OVERRULED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  August 26, 2015.